Filed 5/30/25  In re K.D. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re K.D., a Person Coming Under the Juvenile Court Law. | D085243 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. EJ4777) |
| Plaintiff and Respondent, | |
| v. | |
| D.D. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Mark T. Cumba, Judge.  Affirmed.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant, Mother D.D.

Clare M. Lemon, under appointment by the Court of Appeal, for Defendant and Appellant, Father D.D.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Indra N. Bennett, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

Appellants D.D. (Mother) and D.D. (Father) appeal the juvenile court's order terminating parental rights. (Welf. & Inst. Code,[1] § 366.26.) This is the third appeal in this juvenile dependency matter targeting the juvenile court's findings and orders under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and section 224.2. In the first appeal, we conditionally reversed the juvenile court's jurisdictional and dispositional order declaring minor K.D. a dependent and removing him from his parents' custody. (*In re K.D.* (Jan. 6, 2023, D080817) [nonpub. opn.] (*K.D. I*).) In the second appeal, we conditionally reversed the juvenile court's six-month review order declining to return K.D. to Father's custody. (*In re K.D.* (Sep. 21, 2023, D082387) [nonpub. opn.] (*K.D. II*).) Following remand from both prior appeals, the San Diego County Health and Human Services Agency (Agency) conducted additional ICWA inquiries, and each time the juvenile court found ICWA did not apply.

In this appeal, the parents' sole contention is that the juvenile court erred when it found the Agency conducted a diligent inquiry into K.D.'s Native American heritage at the section 366.26 hearing.[2] In particular, the parents allege the Agency failed to inquire of all necessary family members

---

[1] All undesignated statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2] "The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed." (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852.)

and omitted important information from their inquiry letters to the tribe. Finding no error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In June 2022, the Agency detained minor K.D. and initiated dependency proceedings under section 300, subdivision (b), due to Mother's drug use and Father's failure to protect and supervise.

A. *ICWA Inquiry Prior to Earlier Remands*[3]

In a detention report, the Agency said it inquired regarding K.D.'s ICWA status. Father initially denied having any Native American heritage. But the paternal grandmother told the social worker that she had Cherokee ancestry through her mother and Blackfoot ancestry through her father and she was "looking into" becoming a member, even though neither she nor her parents belonged to a tribe.

Mother told the Agency that her grandmother was previously a tribal Blackfoot member, but that neither she nor K.D. is a member of a tribe. Based on this information, the social worker recommended that the court find that there is reason to believe that the child may be an Indian child and order the Agency to conduct further inquiry regarding the possible Indian status of the child.

At an initial detention hearing in June 2022, both parents submitted Parental Notification of Indian Status forms (ICWA-020). Father again denied any Indian ancestry. Mother's form claimed that she, K.D., and one or more of her lineal ancestors were members of the Blackfoot tribe. She also

---

[3] The parents' only contentions on appeal concern ICWA, and we limit our discussion of the factual and procedural background accordingly. Here, we summarize the pertinent history, drawing on our prior opinions. (See *K.D. I, supra*, D080817; *K.D. II, supra*, D082387.)

claimed to be a resident or domiciled on a tribal trust land. The court ordered the Agency "to complete reasonable inquiry" regarding ICWA.

After the detention hearing, Father reported Cherokee heritage but said "no one has been enrolled yet." He said he would text the dates of birth, birthplaces, and dates of death for family members. A social worker followed up to ask for family members' names and dates of birth, and Father responded that he was struggling to get information because no one ever enrolled.

Mother reported that she has Blackfoot ancestry through a great-great-grandmother who may have been enrolled with the tribe. She provided names for a great-grandmother and her maternal grandmother, along with the maternal grandmother's date of birth. She also provided the name of her uncle who was in the process of registering them and was in contact with the tribe before he passed away in 2021.

In July 2022, the social worker called several other family members about K.D.'s tribal ancestry, including two paternal uncles, the paternal grandmother, and a paternal step-uncle. One of K.D.'s paternal uncles reported Blackfoot and Cherokee ancestry, although he did not think any family member had enrolled, lived on tribal land, or received tribal benefits. He provided the dates of birth for K.D.'s paternal grandparents. Another paternal uncle reported "miniscule amount[s]" of Cherokee and "Blackfoot" heritage, but he largely had "no idea" about his ancestry and did not know of any family member being an enrolled tribal member or living on tribal lands.

K.D.'s paternal grandmother provided the married name, maiden name, and date of birth for a paternal great-grandmother with Cherokee ancestry and reported that a great-grandfather had Blackfoot ancestry. She stated her mother was not an enrolled tribal member and did not live on a

4

reservation. She denied knowledge of her family members receiving tribal benefits or enrolling as members. She explained that the paternal grandfather's parents passed away in 2002 or 2003.

The Agency reported it sent certified inquiries to the Blackfeet tribe, the Cherokee Nation of Oklahoma, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians in early July 2022, and again with "additional information" a week later. The three Cherokee tribes sent response letters, but none were able to establish tribal heritage for K.D. The Agency subsequently reported that it called the Blackfeet tribe the next month.

In August 2022, the court held a contested adjudication and disposition hearing. When the court asked about ICWA, the Agency said it still had "one outstanding letter or response from the Blackfeet tribe." Nevertheless, the Agency asserted: "[B]ased on the totality of the information in the record, including all the prior conversations with all of the relatives and our efforts to garner a response, we can find that there's no reason to believe at this point that there's an Indian child involved." The court agreed, stating, "[t]here's no reason to believe that the Indian Child Welfare Act applies; therefore, I'll find it does not apply at this point." However, the court noted that "[i]f something changes in the future we'll recalendar this."

In December 2022, the social worker asked Mother for contact information for the maternal aunt and maternal uncle. Mother reportedly did not speak with the maternal aunt due to "hostility and tension" and did not have a phone number for the maternal uncle, whom she only spoke to on social media. Mother also reported that her uncle passed away without resolving the questions surrounding the family's Blackfeet heritage and tribal

enrollment. She did not have any additional information about her family's heritage or eligibility with the Blackfeet tribe.

In February 2023, the social worker called the paternal grandfather on four occasions to inquire about Native American heritage, but he did not return the social worker's phone calls. The paternal grandmother informed the social worker that "the grandfather would not call [him] back." She further reported that she divorced the paternal grandfather due to his drug use. She was concerned that Father was living with him, because she believed the paternal grandfather may still use methamphetamine and fentanyl.

B. *ICWA Inquiry Leading Up to the Section 366.26 Hearing*

1. *The Children's Maternal Lineage*

In September 2023, the social worker called Mother to obtain more information about her family members. Mother again said she had no other phone numbers for maternal uncle, but she provided a possible number for his wife. She explained that the paternal great-grandparents were deceased.

The social worker called the maternal uncle's wife on two occasions, and no one answered the phone. The social worker also texted her. There is no evidence to suggest she responded. The social worker also spoke with the maternal great-uncle, who denied Native American heritage. He had no knowledge of any family member receiving tribal benefits or living on a reservation. He had no knowledge of the maternal grandmother or maternal great-uncle's Native American heritage.

The social worker also spoke to a maternal aunt. She had no contact information for the maternal uncle, who was her half-brother. She said he and his wife struggled with addiction, so she chose not to speak to them. She

wanted her contact information to remain confidential from the parents, because she had worked hard to make herself difficult to contact.

The maternal aunt said she grew up in foster care and took a DNA test confirming she had no Native American heritage. She said Mother was "lying to try to manipulate things like she always does." She explained the maternal great-grandmother made claims of Native American ancestry as she got older but had no idea where these claims originated as they came out of nowhere. She stated this was typical for their family, and that the maternal grandmother once claimed they were Jewish, which was also untrue.

At Mother's request, the social worker reached out to the maternal great-uncle. In October 2023, the maternal great-uncle reported that he had completed a DNA test that showed no Native American heritage. He denied any knowledge of Native American ancestry in his family.

In September 2024, the social worker made several attempts to obtain additional details about Native American heritage from Mother. Mother confirmed the primary and alternate names, proper spelling, dates of birth and other identifying information for maternal relatives.

2. *The Children's Paternal Lineage*

The social worker left two additional voicemails for paternal grandfather in September 2023. He did not respond. The social worker spoke again with the paternal uncle, and he denied heritage and had no knowledge of any Native American ancestry in his family, or of any relatives receiving tribal benefits.

In September 2024, the social worker made several attempts to obtain additional details about Native American heritage from Father. The worker finally connected telephonically with Father, to verify the names, dates of

birth, and other details about paternal family members. Father also confirmed the four tribes "of possible affiliation."

Mother informed the social worker that they planned to visit the paternal grandfather later that day and would text additional information about ICWA. The next day, the social worker followed up with Mother, who stated the paternal grandfather had not been home the previous night. Mother assured the social worker that additional information was forthcoming about ICWA, but the social worker never received a text or phone call.

3. *The Agency's Inquiries with the Tribes*

In September 2023, the Agency sent additional inquiry letters to the Blackfeet tribe and three Cherokee tribes. These letters provided clarifying information as follows:

- Paternal grandparents' middle names.

- A year of death for maternal great-grandmother.

- Mother's belief that maternal great-great grandmother may have been enrolled in the Blackfeet tribe.

- A year of death for maternal great-uncle.

- Mother's belief that maternal great-uncle attempted to register the family with the Blackfeet tribe for 10 years before his death.

- A full name, "AKA" name and approximate year of death for paternal great-grandfather.

- A full name and year of death for paternal great-grandmother, as well as the family's belief she may have been part of a Cherokee tribe.

In September 2024, the Agency sent written inquiries via certified mail to the Blackfeet tribe and three Cherokee tribes. These inquiries added the following:

- Removal of the date of death for paternal grandfather.
- Alternate name—spellings and "AKA" names for maternal great-grandmother.

The final round of written inquiries was sent via certified mail a week later, and it included the additional information:

- Alternate names for maternal grandmother and the year she passed away.

- Mother's belief that maternal great-great-grandmother was adopted off the Blackfeet reservation.

- An approximate year of death for maternal great-great grandmother.

All inquiry letters, starting with the undated inquiry letters mailed before the juvenile court took jurisdiction, provided identifying information about the paternal great-grandmother. These letters included her birth date and multiple spellings of her name.

Every tribal response indicated K.D. was not an Indian child or eligible for enrollment. None of the tribes requested additional information from the Agency. The Blackfeet tribe and Keetoowah Cherokee responded by clarifying their blood quantum requirement for enrollment was one-quarter. In September 2024, Eastern Band of Cherokee Indians informed the Agency that K.D. was neither registered nor eligible to register as a tribal member. In October 2024, the United Keetoowah Band of Cherokee Indians clarified the same.

The Agency confirmed the tribes received two inquiry letters in September 2024. In November 2024, the Agency followed up via phone and email with the Cherokee Nation, the Blackfeet tribe, and the Eastern Band of Cherokee Indians.

### 4. *The Juvenile Court's Final ICWA Findings and Order*

At the section 366.26 hearing in December 2024, the juvenile court found the Agency conducted a diligent further inquiry to verify whether K.D. was an Indian child. It found the ICWA did not apply based on the reports, the in-court inquiries, the notices and tribal responses, and there was no reason to know or believe that K.D. is an Indian child. The court explained that this finding was based on previous information provided to the court, and the recent addendum that included "further inquiries and responses." The court terminated parental rights.

## DISCUSSION

### A. *Legal Principles*

Under the California statutes implementing ICWA, if the Agency has "reason to believe" a child may be Native American, the Agency "shall make further inquiry regarding the possible [Native American] status of the child, and shall make that inquiry as soon as practicable." (§ 224.2, subd. (e).) The Agency's duty of further inquiry includes, but is not limited to, interviewing the children's parents and extended family members; contacting the Bureau of Indian Affairs (BIA) and the State Department of Social Services (SDSS) for assistance in identifying the names and contact information of the tribes in which the children may be eligible for membership; and contacting the

relevant tribes and sharing any information necessary for the tribe to make a membership or eligibility determination. (*Id.*, subd. (e)(2)(A)-(C).)

"[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order." (*In re A.M.* (2020) 47 Cal.App.5th 303, 314 (*A.M.*), disapproved on other grounds in *In re Dezi C.* (2024) 16 Cal.5th 1112, 1152, fn. 18.) "Not every error by an agency or department in discharging its duties under section 224.2 will undermine the court's ICWA finding, but the court's ability to exercise discretion in this regard is dependent on adequate record development by the department." (*In re H.M.* (2025) 109 Cal.App.5th 1171, 1181.) " 'On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes.' " *(In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101–1102.)

B. *Substantial Evidence Supports The Juvenile Court's Findings*

The parents argue the Agency failed to adequately fulfill its ICWA inquiry obligations, and therefore the juvenile court prejudicially erred in finding ICWA did not apply to the proceedings. They argue the inquiry was deficient because the Agency: (1) did not interview the paternal grandfather, the paternal great-grandparents, maternal great-uncle, or the maternal uncle, and should have reinterviewed the maternal aunt; (2) did not provide sufficient information in its written inquiries to the tribes and (3) should have inquired with the BIA and the SDSS. We disagree.

1. *The Agency Adequately Inquired With Maternal Family Members*

Despite the Agency's repeated inquiries with Mother and her relatives, Mother argues the Agency should have "re-interviewed" the maternal aunt

11

who shared the relatives Mother asserted had Native American heritage. The maternal aunt, however, did not believe she or Mother had Native American heritage, had taken a DNA test to rule out ancestry, and felt Mother was unreliable. "[S]ocial workers are not required 'to cast about' for investigative leads to satisfy the duties of inquiry." (*In re Allison B.* (2022) 79 Cal.App.5th 214, 220, quoting *A.M., supra*, 47 Cal.App.5th at p. 323, disapproved on other grounds in *Dezi C., supra*, 16 Cal.5th at p. 1152, fn. 18.)

Mother points to *In re Y.W.* (2021) 70 Cal.App.5th 542, for support. There, the Court of Appeal concluded the department of children and family services did not satisfy its duty of inquiry when it "did not make meaningful efforts to locate and interview" the mother's biological parents. (*Id.* at pp. 552–553.) The department argued its duty for "further inquiry" was not triggered because the mother "denied any Indian ancestry." (*Id.* at pp. 553–554.) Here, by contrast, Mother and the maternal aunt were aware of their biological relatives and provided adequate information for the Agency to inquire with the Blackfeet tribe about K.D.'s ancestry.

The Agency's repeated attempts to contact the maternal uncle were unsuccessful. A social worker repeatedly and unsuccessfully attempted to call and text his wife to try to reach him. Neither Mother nor the maternal aunt knew another way to contact him. Moreover, after the input of Mother and other maternal relatives, speaking with him was not reasonably expected to aid the inquiry. The maternal aunt and a maternal great-uncle confirmed they had no heritage through DNA tests, and both maternal great-uncles had no additional information to contribute. The Agency did not need additional input from the maternal uncle to inquire with the tribes about a maternal claim of ancestry. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1053 (*D.S.*) [the

Agency "is not required to 'cast about' for information or pursue unproductive investigative leads"].)

Although the parents criticize the Agency for not interviewing a maternal great-uncle, there is no evidence the Agency had any way to reach him. Family finding efforts did not locate him and the other maternal great-uncle did not know how to reach him. The record contained adequate information for the court to conclude the Agency could not reach him. (See, e.g., *In re Q.M.* (2022) 79 Cal.App.5th 1068, 1083 (*Q.M.*) ["Without reliable contact information, [the department of child and family services] could not reasonably have been expected to interview extended family members."]; *In re K.M.* (2009) 172 Cal.App.4th 115, 119 (*K.M.*) ["Implicit in appellant's argument is that the maternal great-grandmother might have provided information about possible heritage in some other Indian tribe. However, the Agency's request for information needed to contact the great-grandmother was refused. ICWA does not require further inquiry based on mere supposition."].)

2. *The Agency Attempted To Interview Paternal Grandfather*

Although Mother argues that the "inquiry with paternal grandfather . . . is crucial to the entire ICWA inquiry," the social workers called him six times throughout the case, and he never responded. The logical conclusion is he did not want to speak to the Agency. The paternal grandmother disclosed the paternal grandfather's prior drug use and her concern he was still using methamphetamine and fentanyl. She correctly predicted he would not return the social worker's calls. The Agency cannot be expected to interview the paternal grandfather if he is unwilling or unable to make himself available. (See, e.g., *K.M., supra*, 172 Cal.App.4th at p. 119 ["The record shows the Agency attempted on several occasions to elicit

13

further information from the child's family, but was unsuccessful due to the family's hostility toward the Agency. In sum, the Agency did all that can or should be reasonably expected of it to meet its obligation to the child, to the family, to the tribes and to the court."].)

After several failed attempts to contact the paternal grandfather, the social worker tried to contact him through the parents in September 2024, after Mother reported she and Father planned to see him. Mother promised she would text the social worker additional information about ancestry. When the social worker followed up, Mother stated the paternal grandfather had not been home, but she assured the social worker that additional information was forthcoming. Mother never provided additional information. (See, e.g., *Q.M., supra*, 79 Cal.App.5th at p. 1081 ["While the case was pending in the juvenile court, mother was given multiple opportunities to provide names and contact information for extended family members [the department of children and family services] could have contacted, but she did not do so. As a result, the record does not identify any living members of mother's extended family, and on appeal she has not identified any specific individuals whom [the department] should have interviewed. No further inquiry, thus, was possible or required."].)

3. *The Agency's Inquiry Was Not Diminished By Its Failure To Interview The Paternal Great-Grandparents*

The parents argue the Agency "breach[ed]" its "duty" when it failed to interview the paternal great-grandparents. Although the Agency did not interview them, its failure to do so did not diminish the Agency's overall inquiry. The great-grandparents were not "extended family members" with whom initial inquiry is required, and the Agency had sufficient information to adequately inquire with the tribes without speaking to them. (25 U.S.C.

14

1903(2); §§ 224.1, subd. (c)(1); 224.2, subd. (e)(2).) The record establishes it was the paternal grandmother's parents who visited in December 2023. The Agency retained ongoing contact with the paternal grandmother, and she provided all identifying information about her own mother, who had a possible tie to Cherokee heritage.

*D.S., supra*, 46 Cal.App.5th 1041, is instructive. There, an aunt claimed that a distant relative was affiliated with Indian tribes. (*Id.* at p. 1046.) The aunt reported that she learned of the affiliation from her grandmother, but denied her grandmother had further information, that either of them ever lived on a reservation, or that any family member had a tribal enrollment number. (*Ibid.*) We concluded that, although her grandmother may have fallen within the definition of "any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility" pursuant to section 224.2, subdivision (e)(2)(B), the Agency had enough information from the aunt to reasonably conclude that "there was no further information of value to obtain" from her grandmother. (*Id.* at p. 1053.) We thus upheld the juvenile court's findings that the Agency had complied with its further inquiry obligations. (*Ibid.*)

Despite not speaking directly with the paternal great-grandmother, the Agency had acquired and relayed enough information about her to inquire with the tribes and allow them "to make a membership or eligibility determination" about K.D.'s status as an Indian child. (§ 224.2, subd. (e)(2)(B).) In particular, the Agency reported the paternal great-grandmother's full name, the alternate spellings of her name, her date of birth, and details about her purported lineage with a Cherokee tribe out of

15

Oklahoma. Every round of inquiry letters contained this information, and no tribe requested more information or indicated she was or could be a member.

The Agency had multiple conversations with the paternal grandmother and she never reported her own father, the paternal great-grandfather, had Native American heritage. Father also never mentioned that paternal great-grandfather had heritage, including when the Agency reviewed the family tree with him in September 2024. In fact, the parents confirmed the paternal great-grandfather had no Indian ancestry when they spoke in-person with a social worker. This information made it unnecessary for the Agency to directly inquire with the paternal great-grandfather, as he was neither an "extended family member" nor a "person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility . . . ." (25 U.S.C. 1903(2); §§ 224.1, subd. (c)(1); 224.2, subd. (e)(2).)

4. *The Agency's Inquiries To The Tribes Were Adequate*

The parents claim the Agency's written inquiries were defective because the Agency did not include the names of all extended family members, "others who have an interest in the minor" and "any other person" that might have information about K.D.'s tribal affiliation. The parents specifically mention the omission of maternal aunt, maternal uncle, maternal great-uncles, paternal uncles, and paternal great-grandfather.

When inquiring in writing with the tribes, the Agency's duty of further inquiry does not require it to list every extended relative. Instead, the Agency's contact with the tribes "shall include sharing information . . . for the tribe to make an eligibility determination . . . ." (§ 224.2, subd. (e)(2)(C).) Here, the record adequately supports the court's conclusion that the Agency complied with this requirement, because the Agency's September 2024 inquiry letters included the names (including "AKA" names), tribal

16

affiliations, dates of birth, dates of death, and other germane information to determine K.D.'s eligibility.

Following the Agency's interviews of the family members, it would not have been helpful for the tribes to have the names of maternal aunt (who denied heritage and thought Mother was lying about it), maternal uncle (who could not be located), maternal great-uncles (who denied heritage or could not be reached), paternal uncles (who knew very little about the family's heritage, were not enrolled members, and presumably were unknown to the tribes), or paternal great-grandfather (who was not Native American). It only benefitted the tribes to have identifying information for family members with a plausible connection to them, which the Agency provided.

Following our prior opinions in this case, the Agency provided all relevant information to the tribes. Most necessary information was provided in September 2023, and additional information was provided in September 2024. The record confirms that each of the tribes received the inquiry letters. Every tribal response indicated K.D. was not an Indian child or eligible for enrollment. None of the tribes requested additional information from the Agency.

Despite Father's complaint that "[t]he record does not contain the initial ICWA-030 form sent to the tribes," the Agency did not err. (*In re M.W.* (2020) 49 Cal.App.5th 1034, 1046 ["section 224.2, subdivision (e) does not require that any extensive or particular formal documentation of ICWA inquiry be provided to the tribe"].) The Agency also is not required to "report its inquiry efforts to the juvenile court . . . in any particular form at all." (*Ibid.*; *see also H.M., supra,* 109 Cal.App.5th at p. 1184 ["section 224.2, subdivision (e), which provides that proper inquiry be made, does not detail what specific documentation is required when conducting further inquiry"].)

17

5. *The Agency Was Not Required To Inquire With The BIA and SDSS*

Finally, Mother's suggestion the Agency erred by failing to contact the BIA and the SDSS lacks merit. As part of the Agency's duty of further inquiry, it must contact the BIA and the SDSS "for *assistance in identifying the names and contact information* of the tribes in which the child may be a member, or eligible for membership . . . in." (§ 224.2, subd. (e)(2)(B), italics added.) Here, the record does not suggest the Agency was unable to obtain the name and contact information for the tribes. Just the opposite. The Agency knew which tribes to contact, successfully contacted them, and the tribes responded to the Agency's inquiries. Accordingly, the Agency's duty of further inquiry did not require it to contact the BIA or the SDSS because it did not need assistance in identifying the name or contact information of the tribes.

## DISPOSITION

The juvenile court's order terminating parental rights is affirmed.


KELETY, J.

WE CONCUR:


BUCHANAN, Acting P. J.


CASTILLO, J.


18